UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JIMMIE DORTCH,

       Petitioner,                                    Hon. Gordon J. Quist

v.                                                                   Case No. 1:06-CV-796

KENNETH McKEE,

       Respondent.

_____/


## REPORT AND RECOMMENDATION

        This matter is before the Court on Dortch's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Dortch's petition be **denied**.


## BACKGROUND

        As a result of events which occurred on July 21, 2001, Petitioner was charged with assault with intent to commit murder and first degree home invasion. (Trial Transcript, January 24, 2002, 82-83). Several individuals testified on the first day of Petitioner's trial. The relevant portions of their testimony are summarized below.

1

**George Blue, Jr.**

In the early morning hours of July 21, 2001, Blue, who resided at 1145 Agard, heard somebody "tapping" on his door. (Trial Transcript, January 24, 2002, 95-97). Before answering the door, Blue looked outside and saw "a handprint that had blood on it." (Tr. 97). When Blue opened his door, he encountered Walter Jefferson who stated that he had been stabbed by "Jimmie." (Tr. 97-101). Approximately 5-10 minutes later, Mattie Jackson arrived at Blue's residence. (Tr. 101-02). Jackson stated that "Jimmie" had stabbed Walter. (Tr. 102). Blue indicated that Petitioner lived "right down the street" at 1113 Agard, at the corner of Agard and May. (Tr. 104).

**Chris Takemoto**

As of July 21, 2001, Takemoto was employed as a police officer for the City of Benton Harbor. (Trial Transcript, January 24, 2002, 119-20). Early that morning, Officer Takemoto was dispatched to 1145 Agard. (Tr. 120-22). Upon his arrival, Takemoto observed Walter Jefferson laying on the front porch. (Tr. 122-23). Takemoto observed "lung tissue" protruding from a "deep" laceration in Jefferson's side. (Tr. 123-25). After administering first aid to Jefferson, Officer Takemoto asked him "what happened?" (Tr. 125-26). Jefferson responded that "Jimmie stabbed me." (Tr. 126). When asked, "who's Jimmie," Jefferson responded, "he's a guy that lives down at the corner. . .towards May." (Tr. 126). A short time later, two other officers transported Petitioner to Officer Takemoto's location, at which point Mattie Jackson identified Petitioner as the man who stabbed Walter Jefferson. (Tr. 129-30).

Petitioner was subsequently transported to a police station where he was questioned by Officer Takemoto. (Tr. 138-39). Petitioner stated that earlier that evening he arrived home to

discover that his television and video cassette recorder had been stolen. (Tr. 139-40). Petitioner stated that "he thought Walter Jefferson did it." (Tr. 140). Petitioner acknowledged, however, that he had not seen Jefferson "in, around, or near" his residence. (Tr. 140-41). Petitioner indicated that he then "walked down to Mattie's house" where he "confronted Walter Jefferson." (Tr. 140). According to Petitioner, he "threw a punch" after which Jefferson "fell over a table." (Tr. 140). Petitioner declined to discuss the matter further. (Tr. 141).

**Robin Greer**

As of July 21, 2001, Greer was employed as a police officer for the City of Benton Harbor. (Trial Transcript, January 24, 2002, 151). Early that morning, Officer Greer was dispatched to Petitioner's residence to investigate a breaking and entering. (Tr. 151-52). When Greer arrived, she began speaking with Angela Clark. (Tr. 152-53). During their conversation, Officer Greer heard Petitioner state that Walter "had just broke into my house again" and "you better go get him before I do something to him." (Tr. 153). While she was at Petitioner's residence, Officer Greer was requested to transport Petitioner to 1145 Agard in response to a stabbing. (Tr. 153-54). When Greer arrived at 1145 Agard, a woman approached her vehicle and identified Petitioner as the man that stabbed Walter Jefferson. (Tr. 154-55).

**Mattie Jackson**

As of July 21, 2001, Jackson lived at 1134 Agard. (Trial Transcript, January 24, 2002, 166). As of that date, she and Walter Jefferson were living together. (Tr. 167-68). Sometime between 12:00 a.m. and 1:00 a.m. on July 21, 2001, Walter returned home from work. (Tr. 168-73).

3

Shortly after arriving home, Walter left to get something to eat. (Tr. 176-77). When Walter returned home, he reported that he had encountered Petitioner while he was out. (Tr. 176-77). Petitioner accused Walter of breaking into his house. (Tr. 177-78). Walter was worried that he was being accused of something he did not do. (Tr. 178).

Mattie and Walter then sat down and began talking. (Tr. 178). Approximately five minutes later, Mattie heard a knock at the door. (Tr. 183-84). Walter looked outside and saw Petitioner, who pushed the door open and entered the residence. (Tr. 185-87). Petitioner told Walter he "wanted his stuff back." (Tr. 187). Walter tried to explain to Petitioner that "he didn't do anything and that he didn't have anything." (Tr. 188). Petitioner then stabbed Walter and fled. (Tr. 188-96). After he departed, Petitioner stated that "he'll kill the motherfucker." (Tr. 197).

**Walter Jefferson**

At approximately 12:30 a.m. on the morning of July 21, 2001, Walter returned home from work. (Trial Transcript, January 24, 2002, 226-28). Shortly thereafter, Walter left to go to the store. (Tr. 228-29). As he was walking down the street, Walter encountered Petitioner. (Tr. 232). Petitioner accused Walter of breaking into his house and stealing items. (Tr. 232). Walter denied Petitioner's accusations. (Tr. 232). Petitioner then told Walter, "I'm going to kill you." (Tr. 232). Walter told Petitioner, "forget it" and returned home. (Tr. 233). Approximately five minutes later, Walter heard a knock on the door. (Tr. 235). When Walter opened the door, Petitioner forced his way into the residence. (Tr. 235-38). Petitioner hit Walter in the mouth and then stabbed him in the side with a butcher knife. (Tr. 239-40).

The following day, before the presentation of further evidence, Petitioner decided to

4

plead guilty pursuant to a plea agreement. (Plea Transcript, January 25, 2002, 3-5). Plaintiff pleaded guilty to first degree home invasion and, in return, the prosecution dismissed the assault with intent to commit murder charge, as well as two additional supplemental charges. (Tr. 5-6, 12). Prior to being sentenced, however, Petitioner moved to withdraw his guilty plea. (Sentencing Transcript, March 11, 2002, 4-5). Petitioner's motion was denied and he was sentenced to serve 8-20 years in prison. (Tr. 18-20, 37-38). Petitioner appealed his conviction to the Michigan Court of Appeals, asserting the following claims:

> I. Defendant was denied his state and federal constitutional right under the Sixth Amendment to have effective assistance of counsel where appointed counsel: (1) failed to investigate mitigating evidence, (2) failed to interview witnesses, (3) failed to file necessary and dispositive pre-trial motions, (4) gave erroneous advice concerning the plea agreement, (5) coerced and intimidated Defendant into taking a plea, (6) admitted culpability to property damage, and (7) failed to object to certain scoring errors.
>
> II. Defendant was denied his state and federal constitutional right under the Fourteenth Amendment to have due process of law when the trial court denied Defendant's motion to withdraw his guilty plea prior to sentencing.
>
> III. Defendant was denied his state and federal constitutional right under the Fourteenth Amendment to have due process of law when the trial court denied Defendant's petition for the appointment of counsel.
>
> IV. Defendant was denied his state and federal constitutional right under the Fourteenth Amendment to have due process of law when the trial court used misscored offense variables based on inaccurate information to determine Defendant's minimum sentencing guideline range.

The Michigan Court of Appeals dismissed Petitioner's appeal "for failure to pursue

the case in conformity with the rules." *People v. Dortch,* No. 253326, Order (Mich. Ct. App., Mar. 19, 2004). Asserting the same four claims, Petitioner moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Dortch*, No. 126382, Order (Mich., Nov. 22, 2004). Petitioner subsequently appealed the matter again in the Michigan Court of Appeals, asserting the following claims:

> I. The trial court erred in denying Defendant Dortch's presentence motion to withdraw the plea where the plea was involuntarily entered in violation of the state and federal due process clauses.
>
> II. Mr. Dortch's constitutional rights to jury trial and due process were violated where the sentencing court increased the scoring of the sentence guidelines range, and increased the minimum term it imposed based on the guideline range, in reliance on unconvicted conduct that was never admitted by Mr. Dortch at the time of the guilty plea.

The Michigan Court of Appeals denied Petitioner's appeal "for lack of merit in the grounds presented." *People v. Dortch,* No. 265871, Order (Mich. Ct. App., Nov. 16, 2005). Asserting the same two claims, Petitioner appealed the matter in the Michigan Supreme Court. The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Dortch*, No. 130115, Order (Mich., May 30, 2006). On November 6, 2006, Petitioner initiated the present action, asserting the following claims:

> I. The trial court erred in denying Petitioner's presentence motion to withdraw the plea where the plea was involuntarily entered in violation of the state and federal due process clauses.

II. Petitioner's constitutional rights to jury trial and due process were violated where the sentencing court increased the scoring of the sentence guidelines range and increased the minimum term it imposed based on the guideline range in reliance on unconvicted conduct that was never admitted by Petitioner at the time of the guilty plea.

## STANDARD OF REVIEW

Dortch's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

8

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

In certain circumstances, however, the deferential standard articulated above does not apply. First, if the state court resolves a particular claim but fails to articulate its analysis, the Court must apply "modified AEDPA deference." *Vasquez v. Jones*, 496 F.3d 564, 569-70 (6th Cir. 2007). Under this standard, "the court conducts a 'careful' and 'independent' review of the record and applicable law, but cannot reverse 'unless the state court's decision is contrary to or an unreasonable application of federal law.'" *Id.* at 570. However, where the state court has altogether failed to review a particular claim, such is reviewed de novo. As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). In such circumstances, the court conducts a *de novo* review. *Id.*; *see also Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

9

## ANALYSIS

**I.        Guilty Plea**

At the outset of the second day of trial, Petitioner accepted a plea bargain pursuant to which he pleaded guilty to first degree home invasion. In return, the prosecution dismissed the charge of assault with intent to commit murder, along with two additional supplemental charges. Petitioner later sought to withdraw his guilty plea, a request that the trial court denied. Petitioner asserts that he "was confused" about the crime to which he pleaded guilty. Petitioner claims that the trial court's refusal to allow him to withdraw his guilty plea violated his right to due process of law.

When Petitioner first presented this issue on appeal to the Michigan courts, his appeals were simply dismissed without any adjudication on the merits. When the merits of a claim are not addressed by the state courts, a federal habeas court reviews the claim de novo. However, when Petitioner later resubmitted this issue to the Michigan Court of Appeals, the court denied it for lack of merit, but failed to articulate its rationale for doing so. In such a circumstance the Court applies "modified AEDPA deference." While it seems logical that in this circumstance the Court would apply "modified AEDPA deference," the Court has not located any authority addressing this issue in this particular context. Accordingly, in an exercise of caution, the Court will err in Petitioner's favor and review this claim de novo.

A guilty plea is valid if it is made "knowingly, voluntarily, and intelligently." *United States v. Dixon*, 479 F.3d 431, 434 (6th Cir. 2007) (citing *Brady v. United States*, 397 U.S. 742, 748 (1970)); *see also*, *King v. Dutton*, 17 F.3d 151, 153 (6th Cir. 1994) (to be valid, a guilty plea must

be made "voluntarily and intelligently," with "knowledge of the 'relevant circumstances and likely consequences'"). Determining whether a plea satisfies this standard requires "an evaluation of all the relevant circumstances surrounding the plea." *Dutton*, 17 F.3d at 153. To prevail on his claim, Petitioner must demonstrate "such a strong degree of misunderstanding, duress, or misrepresentation by the court, prosecutor, or his own counsel that his plea would become a constitutionally inadequate basis for imprisonment." *Ray v. Cockrell*, 2003 WL 22070892 at *3 (N.D. Tex., Feb. 27, 2003) (citing *Blackledge v. Allison*, 431 U.S. 63, 75 (1977)); *Thomas v. Cain*, 2007 WL 2874778 at *13 (W.D. La., Sept. 7, 2007) (same).

Respondent bears the burden of establishing that Petitioner's guilty plea was voluntary, intelligent, and knowing. *See Stumpf v. Mitchell*, 367 F.3d 594, 600 (6th Cir. 2004) (*reversed in part on other grounds* 545 U.S. 175 (2005)). This burden is generally satisfied "by producing a transcript of the state court proceeding," because "[a] state court finding that the plea was proper is accorded a presumption of correctness, unless the transcript of the plea proceeding is inadequate to demonstrate that the plea was voluntary, intelligent and knowing." *Stumpf*, 367 F.3d at 600 (citing *Garcia v. Johnson*, 991 F.2d 324, 326-27 (6th Cir. 1993)).

Before accepting Petitioner's plea, the trial judge engaged in a lengthy discussion with Petitioner regarding the nature of the crimes with which he had been charged, including the potential punishment if convicted thereof, as well as the precise nature of the rights he was surrendering by pleading guilty. (Plea Transcript, January 25, 2002, 3-18). Petitioner acknowledged on the record that he understood that by pleading guilty he was surrendering the following rights: (1) the right to a trial, either by the court or a jury, (2) the right to be presumed innocent until proven guilty beyond a reasonable doubt, (3) the right to have the witnesses against him appear at trial, (4)

11

the right to question the witnesses against him, (5) the right to compel the attendance at trial of any witness on his own behalf, (6) the right to remain silent at trial, (7) the right to not have any such silence used against him at trial, and (8) the right to testify at trial. (Tr. 8-11). Petitioner also acknowledged that he understood that by pleading guilty to first degree home invasion he faced "up to 20 years in prison." (Tr. 6). The Court further notes that Petitioner's acknowledgment of guilt - made on the record - was clear and without equivocation. (Tr. 15-17).

The record contains no evidence that Petitioner was "confused" regarding the crime to which he agreed to plead guilty. It was clearly explained to Petitioner that he had been charged with and was agreeing to plead guilty to first degree home invasion. The potential punishment for such was also clearly explained to Petitioner. Considering that Petitioner faced life in prison if convicted of assault with the intent to murder, not an unlikely possibility considering the evidence presented on the first day of his trial, his decision to accept the plea bargain was not unreasonable. The record contains no evidence supporting Petitioner's claim that his plea was not made knowingly, intelligently, and voluntarily. Accordingly, the Court concludes that this particular claim is without merit and cannot form the basis for habeas relief.

**II.  Sentencing Claim**

At sentencing, the trial judge observed that this was the third time that Petitioner had appeared before the court to be punished for having engaged in assaultive behavior. (Sentencing Transcript, Mar. 11, 2002, 34-35). As Petitioner correctly notes, however, in this particular matter he pleaded guilty to home invasion not assault with intent to commit murder (or any other assaultive behavior). Petitioner asserts that his constitutional rights were violated because the trial judge

12

sentenced him based on facts (that he engaged in assaultive behavior) that were neither admitted by Petitioner nor found by a jury. Petitioner claims that such violates the Supreme Court's ruling in *Blakely v. Washington*, 542 U.S. 296 (2004). For the same reasons discussed above, the Court will apply a de novo standard of review to this claim.

In *Blakely v. Washington*, 542 U.S. 296 (2004), the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 301 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)). Petitioner asserts that his sentence violates this rule because the trial court, in fashioning his sentence, relied upon facts which were neither admitted nor proven beyond a reasonable doubt.

In *Blakely*, the defendant pleaded guilty to second degree kidnaping involving domestic violence and use of a firearm. *Blakely*, 542 U.S. at 298-99. In so doing, Blakely admitted "the elements of second-degree kidnaping and the domestic-violence and firearm allegations, but no other relevant facts." *Id.* at 299. Washington law provided that the "standard range" to which a defendant, convicted of this particular offense, could be sentenced was 49-53 months. However, the sentencing court was permitted to impose a sentence in excess of the "standard range" if it found "substantial and compelling reasons justifying an exceptional sentence." Before imposing an "exceptional sentence," the sentencing court was required to "set forth findings of fact and conclusions of law supporting it." *Id.*

The State recommended that Blakely receive a "standard range" sentence of 49-53 months. *Id.* at 300. The sentencing court rejected this recommendation, however, and, finding that Blakely acted with "deliberate cruelty," imposed an "exceptional" sentence of 90 months. *Id.* at

13

300-01. As the *Blakely* Court recognized, under Washington law, the court "could not have imposed the exceptional 90-month sentence solely on the basis of the facts admitted in the guilty plea," but instead could do so only based on the court's additional determination that Blakely acted with "deliberate cruelty." *Id.* at 304. The Court held, therefore, that this sentence violated Blakely's Sixth Amendment right to trial by jury because it was predicated on facts that were neither admitted by Blakely nor found by a jury. *Id.* at 301-05.

The *Blakely* Court, however, made clear that its holding applied only to "determinate-sentencing schemes" such as that employed by the State of Washington. *Id.* at 308-09. The Court recognized that *indeterminate* sentencing schemes do not run afoul of the Constitution because while such schemes may sanction "judicial discretion" in sentencing, they do not accomplish such "at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty." *Id.* at 308-09. As the Court recognized:

> Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence - and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned. In a system that says the judge may punish burglary with 10 to 40 years, every burglar knows he is risking 40 years in jail. In a system that punishes burglary with a 10-year sentence, with another 30 added for use of a gun, the burglar who enters a home unarmed is *entitled* to no more than a 10-year sentence - and by reason of the Sixth Amendment the facts bearing upon that entitlement must be found by a jury.

*Id.* at 309.

As is well recognized, the State of Michigan employs an indeterminate sentencing scheme. *See, e.g., Butz v. Berghuis*, 2009 WL 33462 at *3 (W.D. Mich., Jan. 5, 2009); *Jenkins v.*

*Harry*, 2009 WL 103991 at *2 (W.D. Mich., Jan. 14, 2009). Petitioner was convicted of first degree home invasion, which under Michigan law subjected him to a sentence of "not more than 20 years." Mich. Comp. Laws § 750.110a (2001). Petitioner was sentenced to serve 8-20 years in prison. Petitioner's sentence is entirely consistent with Michigan law. When Petitioner committed his crimes he knew that he could possibly receive a sentence of this magnitude. Because Petitioner received a sentence within the range permitted by Michigan law as a result of his convictions, any additional fact-finding in which the trial court may have engaged did not violate Petitioner's constitutional rights. Accordingly, this claim raises no issue on which habeas relief may be granted.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Dortch's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: November 3, 2009 /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge